**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**PATRICIA SINGLETARY,**

**Plaintiff,**

**-vs-**                                                    **Case No.  6:09-cv-1763-Orl-19KRS**

**STOPS, INC.,**

**Defendant.**
_____

## ORDER

This case comes before the Court on the following:

1.    Motion for Summary Judgment by Defendant Stops, Inc. (Doc. No. 39, filed June 16, 2010);

2.    Notice of Filing of Declaration of Donna Knight in Support of Motion for Summary Judgment by Defendant Stops, Inc. (Doc. No. 40, filed June 16, 2010);

3.    Notice of Filing of Deposition Transcript of Travis Grant in Support of Motion for Summary Judgment by Defendant Stops, Inc. (Doc. No. 41, filed June 16, 2010);

4.    Notice of Filing of Deposition Transcript of Dr. Abe Hardoon in Support of Motion for Summary Judgment by Defendant Stops, Inc. (Doc. No. 42, filed June 16, 2010);

5.    Notice of Filing of Deposition Transcript of Patricia Singletary in Support of Motion for Summary Judgment by Defendant Stops, Inc. (Doc. No. 43, filed June 16, 2010);

6.    Motion to Preclude Dr. Abe Hardoon's Testimony at Trial by Defendant Stops, Inc. (Doc. No. 45, filed July 13, 2010);

7.      Opposition to Motion to Preclude Dr. Abe Hardoon's Testimony at Trial by Plaintiff Patricia Singletary (Doc. No. 50, filed July 27, 2010);

8.      Notice of Filing of Affidavit of Dr. Abe Hardoon in Opposition to Motion for Summary Judgment by Plaintiff Patricia Singletary (Doc. No. 52, filed Aug. 4, 2010);

9.      Response in Opposition to Defendant's Motion for Summary Judgment by Plaintiff Patricia Singletary (Doc. No. 55, filed Aug. 12, 2010); and

10.     Reply Memorandum in Support of Summary Judgment by Defendant Stops, Inc. (Doc No. 56, filed Aug. 25, 2010).

**Background**

## I. Undisputed Facts

This is an action under the Family and Medical Leave Act ("FMLA").  On August 28, 2007, Plaintiff Patricia Singletary began working as a customer service representative for Defendant Stops, Inc. ("Stops").  (Doc. No. 43-1 at 6.)  Stops provides transportation, translation, and travel services to workers' compensation claimants and other injured persons throughout the United States.  (Doc. No. 40-1 ¶ 3; Doc. No. 43-1 at 6.)  For the duration of Singletary's employment with Stops, her job duties consisted of answering phones, taking customer requests over the phone, and attending the front desk.  (Doc. No. 43-1 at 6.)

At the commencement of her employment with Stops, Singletary received and read Stops' employee handbook containing Stops' FMLA and attendance policies.  (*Id.*; Doc. No. 43-1 at 38; Doc. No. 43-2 at 32.)  Stops' FMLA policy provided, in pertinent part, the following:

> Employees must provide at least 30 days notice prior to beginning FMLA leave when the need for leave is foreseeable.  When the leave is not foreseeable,

employees need to notify the Company, at least verbally, as soon as the employee learns of the need for leave.

The company may require employees to provide the following: medical certification supporting the need for leave . . .; second or third medical opinions (at the Company's expense); and/or periodic reports during FMLA leave regarding employee status and intent to return to work.

(Doc. No. 43-2 at 1.) Stops' attendance policy provided that unexcused absences or tardiness would result in the following disciplinary action:

1st Occurrence - Verbal Counseling
2nd Occurrence - Written Warning
3rd Occurrence - Written / Final Warning
4th Occurrence - Termination

(*Id.* at 32.)   The term "unexcused absence" was not defined in Stops' employee handbook.

On December 5, 2007, Donna Knight,[1] Stops' Director of Human Resources, issued Singletary a "Verbal Warning" for excessive tardiness.  (Doc. No 43-1 at 14-15; Doc. No. 43-3 at 17.)  Knight advised Singletary that additional tardiness would result in further disciplinary action, up to and including termination.  (Doc. No. 43-3 at 17.)  On December 20, 2007, Singletary received a "Written Warning" for excessive tardiness and absences.  (*Id.* at 23.)  The Written Warning noted that Singletary was tardy or absent on three occasions since the Verbal Warning.  (*Id.*)  The Written Warning provided that additional tardiness or unscheduled absences would result in further disciplinary action, up to and including termination.  (*Id.*)  Singletary's performance review dated December 27, 2007 noted that Singletary's "greatest challenge" was her attendance.  (Doc. No. 43-3 at 22.)

---

[1] Donna Knight was formerly known as Donna Fizer.  (Doc. No. 43-1 at 7.)

On September 8, 2008, Janice McQuay, Singletary's supervisor, issued Singletary a "Final Written Warning" for her excessive tardiness.  (Doc. No. 43-3 at 24; Doc. No. 43-1 at 15.)  The Final Written Warning documented four instances of tardiness between August 27 and September 5, 2008.  (Doc. No. 43-3 at 24.)  The Final Written Warning further provided that additional tardiness or unscheduled absences would result in further disciplinary action, up to and including termination.  (*Id.*)

On February 23, 2009, Jennifer Wingo, Singletary's supervisor, issued Singletary a "30 Day Probation / Final Warning" for excessive tardiness, absenteeism, and performance issues.  (Doc. No. 43-3 at 25.)  This warning listed five instances of tardiness between January 14 and February 17, 2009, one day of absence, and two performance issues.  (*Id.*)  The 30 Day Probation / Final Warning placed Singletary on probation for 30 days and provided that additional performance deficiencies would result in further disciplinary action, up to and including termination.  (*Id.*)  Singletary received an email from Knight on February 25, 2009, warning Singletary that her tardiness "has become a very critical situation . . . placing [her in] danger of . . . losing [her] employment with Stops."  (Doc. No. 43-3 at 27.)

On March 17, 2009, Knight authorized Singletary to leave work for several hours to deal with personal issues involving her boyfriend and the foreclosure of her home.  (Doc. No. 43-1 at 17-18; Doc. No. 43-3 at 28.)  Singletary returned to work that afternoon and worked until closing.  (*Id.* at 18.)  Singletary does not dispute her tardiness and absenteeism through this date.  (Doc. No 43-1 at 16; Doc. No. 53 at 20.)

On Friday, March 27, 2009, Singletary attended work despite feeling sick.  (Doc. No. 43-1 at 19.)  At that time, the boyfriend of Singletary's daughter had contracted mononucleosis and was

living in Singletary's home.  (*Id.*)  Singletary stayed in bed that weekend due to a sore throat, headache, coughing, and fatigue.  (*Id.* at 20.)  Singletary did not attempt to see a doctor during the weekend or the following Monday morning.  (*Id.*)  Singletary came to work on Monday despite not feeling well, and she began to feel worse during the workday.  (*Id.*)  When Wingo arrived at work, Singletary told her that there was a "high possibility" she had mononucleosis and that mononucleosis was "highly contagious."  (*Id.*)  Although Singletary advised Wingo that she could "finish out the day and do [her] job" despite not "feel[ing] good," Singletary "[left] it up to" Wingo whether she should continue working or whether she should leave work to see a doctor.  (*Id.*)  Singletary recounted Wingo's response and her reply as follows:

> In a little bit, she said, Patty, I've never had mono.  She goes, I don't care to get mono and I don't think that we need a bunch of other people out with mono.  If it's possible you have it, it's probably best that you go home.  I said, okay.  I said, I'll go to the doctor today.
>
> She goes, okay, well give me a call tomorrow, let me know what the doctor says, and we'll go from there, and I said okay, so I left.

(*Id.*)

As she left work, Singletary scheduled an appointment at Suntree Internal Medicine ("Suntree") for that afternoon.  (*Id.*)  Singletary saw physician's assistant Travis Grant at Suntree. (*Id.*)  Singletary presented with fatigue, sore throat, and close contact with mononucleosis, but no fever.  (*Id.* at 21; Doc. No. 41-1 at 5.)  Singletary denied fevers, chills, night sweats, cough, runny nose, congestion, sinus tenderness, or nausea.  (Doc. No. 41-1 at 17.)  Singletary tested negative for strep throat.  (*Id.* at 6.)  Singletary's electronic records at Suntree indicated that Singletary's bilateral tympanic membranes were dull.  (*Id.* at 17-18.)  In view of Singletary's symptoms and exposure to her daughter's boyfriend, Grant determined that Singletary possibly had mononucleosis.  (*Id.* at 5.)

Grant directed Singletary to have a blood test for mononucleosis, and Grant scheduled a follow-up appointment for Friday, April 3 to review the results.  (Doc. No. 43-1 at 20-21.)  Grant encouraged Singletary to take over-the-counter Tylenol.  (Doc. No. 41-1 at 5.)

During the March 30 appointment, Singletary told Grant about her issues with absenteeism and tardiness at work.  (Doc. No. 43-1 at 21.)  According to Singletary, Grant said that it was "up to [her]" whether she felt well enough to work the next day, but if her symptoms worsened, it would be best for her to stay home because it was unclear whether Singletary had mononucleosis and because mononucleosis is contagious.[2]  (Id.)  Grant did not tell Singletary that she must refrain from working while the mononucleosis test was pending or that she otherwise needed to take the entire week off.[3]  (Id. at 26; Doc. No. 41-1 at 9.)

Singletary began to run a fever on Monday night, and her symptoms worsened by Tuesday morning.  (Id. at 21.)  Singletary called Wingo between 8:30 and 9:00 on Tuesday morning.  (Id.)  Singletary was unable to reach Wingo, and Wingo did not have voicemail.  (Id.)  Singletary also attempted but was unable to reach Ashley Hudson, a member of the human resources department,

---

[2] Grant testified during his deposition that mononucleosis is transmitted through saliva, usually by kissing, sharing glasses, or through the air if saliva becomes airborne.  (Doc. No. 41-1 at 5.)

[3] Grant's June 29, 2009 affidavit states that "Singletary was advised to refrain from work during the period for which she was under my care," March 30, 2009 through April 3, 2009.  (Doc. No. 43-3 at 43.)  Grant qualified this statement in his subsequent deposition testimony.  Although Grant did not recall during his deposition what he specifically told Singletary on March 30, Grant identified his May 14 note stating that he advised Singletary on March 30 "to refrain from work if possible until symptoms improved."  (Doc. No. 41-1 at 7-8, 22.)  Grant maintained that the words "refrain from work if possible" reflected his lack of knowledge about the circumstances of Singletary's employment with Stops and did not represent a judgment about whether Singletary was incapacitated from working.  (Id. at 10.)  Moreover, Grant contended that even if he had determined on March 30 that Singletary had mononucleosis and even if he knew Singletary's job duties, he would have given her a strong recommendation not to work, but he would not have prohibited Singletary from working or concluded that Singletary was unable to do her job.  (Id. at 6-7, 9-10.)

or Knight.  (*Id.*)  Singletary then left a voicemail for Hudson explaining "what had happened the prior day with [Wingo]," that she was "sick," that she "had been to the doctor Monday," that she "had a doctor's note," and that she "would not be in."  (*Id.* at 21.)

Based on Singletary's voicemail for Hudson and Singletary's prior unexcused absences and tardiness, Knight decided to terminate Singletary.  (Doc. No. 40-1 ¶ 6.)  Singletary received a voicemail from Hudson on Tuesday afternoon notifying Singletary that she had been terminated for calling out of work after receiving a Final Warning.  (Doc. No. 43-1 at 21.)  Singletary returned Hudson's call on Tuesday and informed Hudson that it was "very highly possible" that she had mononucleosis, that she had a doctor's note, that Wingo sent her home on Monday, and that she had attempted to call Wingo that morning per Wingo's instructions.  (*Id.*)  Hudson told Singletary that Knight would call her, and Knight called Singletary later that afternoon.  (*Id.* at 21-22.)  Singletary informed Knight that Wingo had sent her home on Monday, that she "had been to the doctor," that she "had a doctor's note," that she felt she had mononucleosis, that she was waiting for mononucleosis test results, that she did not "feel good," and that she was "running a temperature." (*Id.* at 22.)

Singletary pleaded with both Hudson and Knight not to terminate her.  (*Id.* at 21-22.) Singletary maintains that Hudson and Knight said that there was no way they could allow her to continue working due to her absences and Stops' absenteeism policy.  (*Id.* at 22.)  On the other hand, Knight maintains that she told Singletary that she could save her job by coming into work Tuesday afternoon and that Singletary refused to do so.  (Doc. No. 40-1 ¶ 8.)  Knight did not interpret Singletary's calling in sick as a request for FMLA leave or notification of a serious health condition.

(*Id.* ¶ 9.)  Rather, Knight viewed Singletary's actions as a continuation of her trend of excessive absenteeism and tardiness after repeated warnings and probation.  (*Id.*)

During her telephone calls to Hudson and Knight on Tuesday, March 31, Singletary claimed to possess a doctor's note stating that Singletary should refrain from work "if possible."  (Doc. No. 43-1 at 21-23.)  Initially during her deposition, Singletary maintained that she in fact had a doctor's note and that she never gave that note to Stops because she was terminated and did not enter Stops' office after being terminated.  (*Id.* at 23.)  Singletary later testified that she could not remember whether she actually possessed a doctor's note on Tuesday, March 31 or whether she merely believed she could acquire a doctor's note.  (*Id.* at 27.)  Other than Singletary's equivocal deposition testimony, there is no evidence in the record that Singletary actually possessed a doctor's note on Tuesday, March 31.[4]  Further, there is no evidence in the record that Singletary requested FMLA leave or that Singletary told Hudson or Knight how long she expected to be out of work.  (*Id.* at 25-26.)

Singletary attended the follow-up appointment with Grant on Friday, April 3, 2009.  (*Id.* at 23.)  The blood test taken on March 30 showed that Singletary did not have mononucleosis at that time, and Grant diagnosed Singletary with pharyngitis, meaning inflammation of the pharynx.  (*Id.*; Doc. No. 41-1 at 8, 16.)  Grant prescribed an antibiotic for Singletary.  (Doc. No. 43-1 at 24.)  Singletary did not see a doctor or a physician's assistant other than Grant on March 30 or April 3.

---

[4] In view of Singletary's deposition testimony and the absence of contrary evidence, the doctor's notes dated April 3, 2009 and May 14, 2009 were not in Singletary's possession on March 31, 2009.  (Doc. No. 43-1 at 24-25; Doc. No. 43-3 at 30-31.)  The April 3, 2009 doctor's note was prepared pursuant to Singletary's post-termination request for a doctor's note covering the entire week at issue.  (Doc. No. 43-1 at 24.)

(*Id.* at 26.)  After April 3, 2009, Singletary did not present to a doctor or physician's assistant for treatment of her pharyngitis.  (*Id.* at 30.)

## II.  Parties' Contentions

On October 23, 2009, Singletary filed an amended complaint asserting that Stops unlawfully terminated her because she was entitled to FMLA leave.  (Doc. No. 6.)  Stops has filed a motion for summary judgment and a motion to preclude the testimony of Dr. Abe Hardoon, the physician who supervised Grant.  (Doc. Nos. 39, 45.)  Singletary opposes both motions.  (Doc. Nos. 50, 53.)

### Standard of Review

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled judgment as a matter of law."  Fed. R. Civ. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004).  An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case.  *Hickson Corp.*, 357 F.3d at 1259.  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party.  *Id.* at 1260.  A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.*; *Anderson*, 477 U.S. at 251-52.

The party moving for summary judgment has the burden of proving that: (1) there is no genuine issue as to any material fact, and (2) it is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in the light most

favorable to the party opposing the motion and resolves all reasonable doubts against the moving

party. *Anderson*, 477 U.S. at 255. The court may not weigh conflicting evidence or weigh the

credibility of the parties. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993).

If a reasonable fact finder could draw more than one inference from the facts and that inference

creates an issue of material fact, a court must not grant summary judgment. *Id.* On the other hand,

summary judgment must be granted "against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which the party will bear

the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. In addition, when a claimant fails to

produce "anything more than a repetition of his conclusory allegations," summary judgment for the

movant is "not only proper but required." *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1981).

### Analysis

Stops challenges the admissibility of Hardoon's testimony at trial, and Singletary has filed

an affidavit by Hardoon in opposition to Stops' Motion for Summary Judgment. (Doc. No. 45; Doc.

No. 52-1). Because affidavits filed in opposition to summary judgment must set out facts that would

be admissible in evidence, Fed. R. Civ. P. 56(e), the Court will determine whether Hardoon's

testimony is admissible before considering Stops' Motion for Summary Judgment.

## I. Admissibility of Hardoon's Testimony

Stops presumes that Singletary will elicit Hardoon's expert opinion about Grant's diagnosis

of Singletary and whether Singletary had an FMLA-qualifying medical condition. (Doc. No. 45.)

Stops argues that such testimony is inadmissible because: (1) Hardoon was not properly disclosed

in an expert report pursuant to Federal Rule of Civil Procedure 26(a)(2)(B) and the Case

Management and Scheduling Order; and (2) Hardoon did not treat Singletary and thus could not give relevant testimony about whether Singletary had an FMLA-qualifying health condition. (*Id.* at 1.)

### A.  Proper Disclosure of Hardoon

Singletary disclosed Hardoon in her expert witness disclosure dated April 16, 2010. (Doc. No. 45-1 at 1.) Hardoon's curriculum vitae and the Suntree's electronic records for Singletary's March 30 and April 3 appointments with Grant were attached to the expert disclosure. (*Id.* at 3-10.) Stops contends that this documentation fails to comply with the expert report requirements under Fed. R. Civ. P. 26(a)(2)(B). (Doc. No. 45 at 2-4.) Singletary argues in response that Hardoon was exempt from the expert report requirements or, alternatively, that the failure to properly disclose Hardoon was harmless. (Doc. No. 51.)

### 1.  Expert Report Requirement

A party must present a report for any expert witness that is "retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B). The Case Management and Scheduling Order provides that "[e]xpert testimony on direct examination at trial will be limited to the opinions, bases, reasons, data, and other information disclosed in the written expert report . . . ." (Doc. No. 19 at 3, filed Dec. 21, 2009.)

Although the parties dispute whether Hardoon is a "treating physician," the label of "treating physician" is irrelevant to whether Hardoon's proposed testimony must be disclosed in an expert report. Like the other provisions of Rule 26, the expert report requirement turns on the substance of the testimony of the witness, not the status or categorization of the witness. *See Brown v. Best Foods*, 169 F.R.D. 385, 388 (N.D. Ala. 1996) ("The plaintiff can[]not avoid the requirements of

Rule 26 by simply indicating that [her] experts are plaintiff's treating physicians. . . . Rule 26 focuses not on the status of the witness, but rather the substance of the testimony." (quoting *Bucher v. Gainey Transp. Serv. Of Ind.*, 167 F.R.D. 387, 390 (M.D. Pa. 1996))).

"A treating physician does not need to submit an expert report if planned testimony was acquired 'not in preparation for trial, but rather because he was an actor or viewer with respect to transactions or occurrences that are a part of the subject matter of the lawsuit.'" *Baratta v. City of Largo*, No. 8:01-CV-1894-T-EAJ, 2003 WL 25686843, at *2-3 (M.D. Fla. Mar. 18, 2003) (quoting Fed. R. Civ. P. Rule 26 advisory committee's note, 1993 amendment). Thus, a physician designated as an expert witness may give expert testimony without an expert report on matters "based on the examination and treatment of the patient." *Id.* at *2 (citing *Salas v. United States*, 165 F.R.D. 31, 33 (W.D.N.Y. 1995)). Conversely, "[i]f the treating physician testifies on information gathered outside of the course of treatment and the party does not file a Rule 26(a)(2)(B) report as to that testimony, it may be excluded." *Id.* at *3 (citing *Shapardon v. W. Beach Estates*, 172 F.R.D. 415, 416 (D. Haw.1997)); *see also Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 870 (6th Cir. 2007) ("When the nature and scope of the treating physician's testimony strays from the core of the physician's treatment, Fed. R. Civ. P. 26(a)(2)(B) requires the filing of an expert report from that treating physician.").

Hardoon did not personally examine Singletary on March 30 or April 3, 2009. Instead, at least twenty-four hours after Singletary's appointments, Hardoon reviewed the electronic record of notes made by Grant for the purpose of assessing Grant's diagnosis and plan of action. (Doc. No. 42-1 at 3-5; Doc. No. 41-1 at 4.) Hardoon did not consider any other information or confer with Grant in verifying Grant's treatment of Singletary. (Doc. No. 41-1 at 4; Doc. No. 42-1 at 3.) This

procedure was consistent with both Suntree internal procedures and the Florida administrative rules prohibiting physician's assistants from making final diagnoses unless such delegation is expressly permitted by statute and from interpreting laboratory tests without the interpretation and final review of a supervising physician.  (Doc. No. 41-1 at 4; Doc. No. 42-1 at 3); Fla. Admin. Code 64B8-30.012(2)(a)-(b).   Finding no statute permitting Grant to make Singletary's final diagnosis, Hardoon's review of Grant's diagnosis and proposed treatment of Singletary was part of Singletary's treatment, and Hardoon's opinions about the diagnosis and treatment of Singletary based on the electronic record of Grant's notes are exempt from required disclosure in an expert report.  *See Indem. Ins. Co. of N. Am. v. Am. Eurocopter LLC*, 227 F.R.D. 421, 424 (M.D.N.C. 2005) (noting that an individual may give an expert opinion without a Rule 26 expert report if the expert "has a connection with the case by being a participant in the events").

Unlike opinions about the diagnosis and treatment of Singletary, any opinion by Hardoon about whether Singletary qualified for FMLA leave must be disclosed in an expert report. Singletary qualified for FMLA leave if she had a "serious health condition" that made her "unable to perform the functions of [her] position . . . ."[5] 29 U.S.C. § 2612(a)(1)(D).  The electronic medical reports approved by Hardoon contain no information about Singletary's job functions and no information that Singletary left work on Monday, March 30 due to her health condition.  (Doc. No. 41-1 at 15-20.)  Further, there is no evidence in the record that Hardoon knew of Singletary's job functions through prior treatment of Singletary.  (Doc. No. 42-1 at 3.)  Because any opinion concerning Singletary's eligibility for FMLA leave implicates facts beyond the scope of Hardoon's

---

[5] The parties do not contend that Singletary qualified for FMLA leave under any other provision of 29 U.S.C. § 2612(a)(1).

diagnosis and treatment of Singletary as reflected in the Suntree electronic reports, such expert opinions must be disclosed in an expert report pursuant to Fed. R. Civ. P. 26(a)(2)(B).  *Cf. Baratta*, 2003 WL 25686843, at *2 (permitting a physician to give expert testimony without an expert report on matters "based on the examination and treatment of the patient").

### 2. Compliance with Fed. R. Civ. P. 26(a)(2)(B)

Having found that Hardoon's opinions concerning Singletary's eligibility for FMLA leave must be disclosed in an expert report, the Court now considers whether Singletary's disclosures on April 16, 2010 complied with the expert report disclosure requirements.  An expert report under Federal Rule of Civil Procedure 26(a)(2)(B) must contain:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the data or other information considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v) a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and
>
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

In addition, the expert report must be "prepared and signed" by the witness.  Fed. R. Civ. P. 26(a)(2)(B).

Hardoon's expert report consists of the Suntree electronic notes and Hardoon's curriculum vitae.  (Doc. No. 45-1).  These documents do not satisfy the first or second requirements under Federal Rule of Civil Procedure 26(a)(2)(B).  Hardoon's expert report is devoid of a statement of

Hardoon's opinions, including whether Singletary had an FMLA-qualifying medical condition. There is also no information in the expert report about Singletary's job functions from which an opinion could be made about whether Singletary was unable to work due to her illness.[6] Hardoon's expert report is also deficient because it does not disclose whether any exhibits would be used to summarize or support Hardoon's opinions, whether Hardoon has authored any publications in the previous ten years, or whether Hardoon has testified as an expert in any other cases in the past four years. In addition, Hardoon did not sign the expert report. Except for the disclosure of Hardoon's witness fee in his curriculum vitae, Hardoon's expert report lacks all of the components required by Federal Rule of Civil Procedure 26(a)(2)(B).

### 3. Consequences for Failure to Comply with Rule 26(a)(2)(B)

"If a party fails to provide information . . . as required by [Rule 26(a)(2)(B)], the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "The district court has broad discretion in deciding whether a failure to disclose evidence is substantially justified or harmless under Rule 37(c)(1)." *U.S. ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*, No. 8:06-cv-40-T-33MAP, 2009 WL 92826, at *3 (M.D. Fla. Jan. 14, 2009). In determining whether the failure to sufficiently disclose an expert witness is substantially justified or harmless, courts are guided by, *inter alia*, the following factors: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing

---

[6] As discussed *infra* part II.A, Singletary must prove that she was unable to work due to her illness in order to qualify for FMLA leave.

party's explanation for its failure to disclose the evidence." *Id.* (quoting *Two Men & A Truck Int'l Inc. v. Residential & Commercial Transp. Co., LLC*, Case No. 4:08-cv-67-WS/WCS, 2008 WL 5235115, at *2 (N.D. Fla. Oct. 20, 2008)). "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party." *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 697 (N.D. Ga. 2006) (citations omitted).

Singletary contends that Stops' deposition of Hardoon after the disclosure of Hardoon's expert report cured any surprise and prejudice to Stops.  (Doc. No. 50 at 7.)  A comparison of Hardoon's deposition testimony to Hardoon's affidavit filed in opposition to Stops' Motion for Summary Judgment shows otherwise.

During his deposition, Hardoon testified about the effect of Singletary's health condition on her ability to work as follows:

> Q: Based on what – on the records you've reviewed from [Monday, March 30], would you have advised Miss Singletary that she was unable to work?
>
> A: Knowing what you told me as to what she does for a living?  I would probably tell her not to because she is going to be on the phone all day, and scratchy throat.
>
> Q: Okay.
>
> A: It's uncomfortable.  You don't want to talk – talk as little as you can.
>
> Q: All right.  What if she told you that she had no more sick time left and she really needed to go back to work, would you have told her that she still had to stay away from work?
>
> A: My advice would probably be if that's the type of work that you do, call them and tell them, you know, you'll make it up another time or whatever, but it's your choice. I mean, I can't tell somebody, hey, don't go, and I can make you don't [sic] go.

(Doc. No. 42-1 at 6.)

When asked during his deposition whether he would have advised Singletary that she was unable to work on March 30, Hardoon did not respond directly or affirmatively.  Instead, he stated what he "probably" would have told Singletary, and he testified that working would be "uncomfortable" for Singletary and that it was her "choice" whether to work.  (*Id.*)  In contrast to this deposition testimony, Hardoon's affidavit filed in opposition to the Motion for Summary Judgment contained the following opinion:

> During the period of March 30, 2009 through April 5, 2009, Ms. Singletary's conditions rendered her incapacitated to return to work.

(Doc. No. 52-1 ¶ 13.)  The affidavit contains no facts supporting the opinion that Singletary was "incapacitated," meaning unable to work "due to the serious health condition, treatment therefore, or recovery therefrom."  29 C.F.R. § 825.113(b).

Consideration of Hardoon's expert opinion by affidavit on Motion for Summary Judgment or allowing Hardoon to testify as an expert at trial about the effect of Singletary's health condition on her ability to work would prejudice Stops because Stops has received no prior notice of the expert opinion of Hardoon offered in the affidavit or of the facts underlying Hardoon's opinion that Singletary was "incapacitated to return to work."  (Doc. No. 52-1 ¶ 13.)  The prejudice to Stops is amplified by Hardoon's legally inconsistent statements that working would be "uncomfortable" for Singletary, contained in his deposition testimony, and that Singletary was "incapacitated," contained in his subsequent affidavit.  *See Olsen v. Ohio Edison, Co.*, 971 F. Supp. 1159, 1166 (N.D. Ohio 1997) (noting that there is no incapacity under the FMLA where it is merely "uncomfortable or inconvenient for the employee to have to work").  Accordingly, Stops would be prejudiced both on Motion for Summary Judgment and at trial by consideration of Hardoon's expert testimony that Singletary was "incapacitated to return to work" between March 30 and April 5.

-17-

Singletary's brief and meritless explanation for failing to disclose the information required by Rule 26(a)(2)(B) also persuades the Court that Singletary's actions were not substantially justified. Singletary provides no explanation for Hardoon's failure to sign the expert report or the absence of a statement of Hardoon's opinions in the report. Singletary asserts that Hardoon's expert report did not disclose his expert witness history or publications because he had no expert witness history or publications. (Doc. No. 50 at 7.) This is no excuse; Rule 26(a)(2)(B) requires a party to disclose the fact that an expert witness has no prior expert witness experience or publications. *See* Fed. R. Civ. P. 26(a)(2)(B) ("The report *must* contain: . . . ." (emphasis added)).

Further, the extent of Singletary's noncompliance with Rule 26(a)(2)(B) frustrates the Court's control of orderly presentation of evidence at trial and the scope of expert testimony. *See supra* part I.A.2 (noting that Singletary failed to comply with all but one of the six enumerated disclosures under Rule 26(a)(2)(B) and that Hardoon did not sign the expert report). A primary purpose of the expert report disclosure rule is to narrow the issues for trial by limiting expert testimony to the matters disclosed in the expert report. The Case Management and Scheduling Order makes this clear:

> Expert testimony on direct examination at trial will be limited to the opinions, bases, reasons, data, and other information disclosed in the written expert report disclosed pursuant to this Order. Failure to disclose such information may result in the exclusion of all or part of the testimony of the expert witness.

(Doc. No. 19 at 3.) Because Hardoon's expert report contains no statement of Hardoon's expert opinion(s) as required by Rule 26(a)(2)(B)(i), the Court has no way of limiting Hardoon's expert testimony to the contents of the expert witness report at trial pursuant to the Case Management and Scheduling Order.

For the reasons stated above, Singletary's failure to properly disclose an expert report for Hardoon was neither harmless nor substantially justified.  Pursuant to Federal Rule of Civil Procedure 37(c)(1), Hardoon's expert opinions beyond his treatment of Singletary, including the effect of Singletary's health condition on her ability to work, must be excluded.[7]

## II.  Motion for Summary Judgment

The FMLA entitles eligible employees of a covered employer to receive up to twelve weeks of unpaid leave per year due to a "serious health condition that makes the employee unable to perform the functions" of employment.  29 U.S.C. § 2612(a)(1)(D).  An employee who lawfully takes FMLA leave is entitled to reinstatement to the position the employee held when leave was taken or an equivalent position.  *Id.* § 2614(a)(1).  The parties dispute whether Singletary qualified for FMLA leave on March 30.

"[T]he FMLA creates two types of claims:  interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, . . . and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act . . . ."  *Strickland v. Water Works and Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (citations omitted).  Both types of claims require proof that the eligible employee was entitled to take FMLA leave.  *See Russell v. N. Broward Hosp.*, 346 F.3d 1335, 1340 (11th Cir. 2003) (finding it unnecessary to determine whether plaintiff pled an interference or retaliation claim because plaintiff did not establish a "serious health

---

[7] Rule 37(c)(1) provides that the Court, "on motion and after giving an opportunity to be heard," may impose any of the sanctions enumerated in Rule 37(b)(2)(A) in lieu of precluding the insufficiently disclosed expert testimony.  Because neither party moved for alternative sanctions and because Rule 37(c)(1) does not authorize the Court to consider alternative sanctions *sua sponte*, the Court will preclude Hardoon's expert opinions requiring disclosure in an expert report.

condition," a requirement for entitlement to FMLA leave).  An employee must also "provide her employer with notice sufficient to make the employer aware that her absence is due to a potentially FMLA-qualifying reason."  *Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379, 1386 (11th Cir. 2005) (quoting *Gay v. Gilman Paper Co.*, 125 F.3d 1432, 1436 (11th Cir. 1997)).

It is unclear from Singletary's Amended Complaint whether she asserts an interference claim, a retaliation claim, or both.  (Doc. No. 6.)  Stops contends that it should be granted summary judgment in any case because: (1) Singletary had no qualifying reason for FMLA leave; and (2) Singletary failed to provide sufficient information to reasonably apprise Stops of a serious health condition entitling Singletary to FMLA leave.  (Doc. No. 39 at 22.)

### A.  Existence of FMLA-Qualifying Serious Health Condition

To qualify for FMLA leave, Singletary must prove that she had "serious health condition" that made her "unable to perform the functions of [her] position . . . ."  29 U.S.C. § 2612(a)(1)(D). An employee has a "serious health condition" if: (1) the employee is incapacitated, meaning unable to work, for more than three consecutive, full calendar days; and (2) the employee is receiving "treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider."  29 C.F.R. §§ 825.113(a), (b), 825.115(a)(2).

The Eleventh Circuit has not addressed whether lay witness testimony alone can create a genuine issue of material fact that an employee was incapacitated for three consecutive, full calendar days.  Although some district courts have held that a health care provider's professional medical opinion is the only evidence that can establish incapacity, every Circuit Court of Appeals to have addressed the issue has held that lay testimony is relevant.  *See Schaar v. Lehigh Valley Health*

*Servs., Inc.*, 598 F.3d 156, 159-60 (3d Cir. 2010) (collecting cases).   However, Circuit Courts

disagree about whether lay testimony alone can create a genuine issue of material fact regarding

incapacity or whether some expert medical testimony must supplement lay testimony.   *Compare*

*Lubke v. City of Arlington*, 455 F.3d 489, 495-96 (5th Cir. 2006) (lay testimony alone sufficient),

*and Marchisheck v. San Mateo County*, 199 F.3d 1068, 1074 (9th Cir. 1999) (same), *with Schaar*,

598 F.3d at 160-61 (requiring some medical expert testimony to support lay testimony to create a

genuine issue of material fact regarding incapacity), *and Rankin v. Seagate Techs., Inc.*, 246 F.3d

1145, 1148-49 (8th Cir. 2001) (same).   Even under the most permissive rule, that lay testimony

alone can create a genuine issue of material fact regarding incapacity, the evidence of record does

not create a genuine issue of material fact that Singletary was incapacitated for three consecutive,

full calendar days.

 Singletary's testimony does not contain any evidence from which a reasonable trier of fact

could conclude that she was incapacitated for three consecutive, full calendar days.   On Monday,

March 30, Singletary admitted to Wingo that although she did not "feel good," she could "finish out

the day and do [her] job."   (Doc. No. 43-1 at 20.)   Singletary further described her condition on

Monday as follows:

> I just was feeling very tired.   It was hard to concentrate.   I just wanted to sleep. . . .
> My throat was hurting, so it was bothering me to talk on the phone.   It was just very
> uncomfortable.

(*Id.*)   The following morning, Singletary felt much worse.   (*Id.* at 21.)   However, she was able to

make phone calls, leave a voicemail for Hudson, and speak on the phone with Hudson and Knight

later that day.   (*Id.* at 21-22.)   The discomfort suffered by Singletary from talking on the phone is

not equivalent to an inability to work for purposes of incapacity under the FMLA.   *See Olsen*, 971

F. Supp. at 1166 (noting that there is no incapacity under the FMLA where it is merely "uncomfortable or inconvenient for the employee to have to work").

According to Singletary, Travis Grant, the physician's assistant who examined Singletary on Monday, March 30, advised her "to refrain from work if possible." (*Id.* at 23.)  However, this statement and Grant's deposition testimony explaining this statement do not show that Singletary was unable to work. *See supra* note 3 (summarizing Grant's deposition testimony that he never told Singletary she was physically unable to work and that Singletary would have been physically able to work even if she had mononucleosis on March 30).  Finding no admissible evidence in the record to the contrary, Singletary was not incapacitated for more than three consecutive, full calendar days as required to establish the existence of a serious health condition under the FMLA.[8]

_____

[8] When Hardoon was asked during his deposition whether he would have advised Singletary that she was "unable to work" on March 30, he responded that he "would probably tell her not to [work] because she is going to be on the phone all day [with a] scratchy throat. . . . It's uncomfortable." (Doc. No. 42-1 at 6.)  Hardoon further stated that it was Singletary's "choice" whether to work. (*Id.*)  Because mere discomfort does not constitute incapacity under the FMLA, *Olsen*, 971 F. Supp. at 1166, Hardoon's deposition testimony regarding the effect of Singletary's health condition on her ability to work is consistent with Grant's testimony that Singletary was able to work on March 30.

In his affidavit filed in opposition to Stops' Motion for Summary Judgment, Hardoon opined that Singletary's health condition rendered her "incapacitated to return to work" between March 30 and April 5. (Doc. No. 52-1 ¶ 13).  As discussed above in Part I, that expert opinion inadmissible due to Singletary's failure to comply with the expert disclosure requirements under Federal Rule of Civil Procedure 26(a)(2)(B).  Notwithstanding Singletary's failure to comply with Rule 26(a)(2)(B), the expert opinion does not create a genuine issue of material fact on the issue of incapacity.  The expert opinion is not supported by any factual averments and is contrary to Hardoon's prior deposition testimony that Singletary's medical condition made working "uncomfortable" and that it was Singletary's "choice" whether to work. (Doc. No. 42-1 at 6).  Because Hardoon's opinion in his affidavit contradicts his prior deposition testimony without explanation, such opinion alone cannot create a genuine issue of material fact. *See Van T. Junkins & Assocs., Inc. v. U.S. Indus.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create (continued...)

Because Singletary did not have an FMLA-qualifying serious health condition, summary judgment must be granted for Stops on Singletary's FMLA interference and retaliation claims regardless of whether Singletary provided sufficient notice of her health condition to Stops.  *See Russell*, 346 F.3d at 1340 (finding the absence of a serious health condition fatal to the plaintiff's FMLA interference and retaliation claims).  However, as both parties have presented argument on the issue of the sufficiency of Singletary's notice to Stops, the Court will address this issue in an abundance of caution.

### B.  Notice to Stops

Where an employee's need for FMLA leave is unforeseeable, as in the instant case of sudden illness, "the employee need only provide her employer with notice sufficient to make the employer aware that her absence is due to a potentially FMLA-qualifying reason."  *Cruz*, 428 F.3d at 1382 (quoting *Gay*, 125 F.3d at 1436).  "[I]n determining whether the employee's notice was sufficient, 'the critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.'"  *Gay*, 125 F.3d at 1435 (quoting *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 764 (5th Cir. 1995)).  "When an employee seeks leave for the first time for a FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA."  29 C.F.R. § 825.303(b).  However, "calling in 'sick' without providing more information will not be considered sufficient notice by an employee to trigger an employer's obligations under the [FMLA]."  *Id.*  Additional information sufficient to meet the employee's notice burden includes, but is not limited to, a

---

(...continued)

such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").

statement "that a condition renders the employee unable to perform the functions of the job . . . and the anticipated duration of the absence, if known." *Id.* "What is practicable, both in terms of the timing of the notice and its content, will depend upon the facts and circumstances of each individual case." *Manuel*, 66 F.3d at 764. An employee's verbal notice alone may be sufficient. *See Satterfield v. Wal-Mart Stores, Inc.*, 135 F.3d 973, 980 (5th Cir. 1998) ("While an employer's duty to inquire [about FMLA eligibility] may be predicated on statements made by the employee, the employer is not required to be clairvoyant." (quotation omitted)); *Tornberg v. Bus. Interlink Servs., Inc.*, 237 F. Supp. 2d 778, 784-85 (E.D. Mich. 2002) (finding that a truck driver gave sufficient notice by telling his employer that he was unable to return to work due to the pain from a recently found kidney stone). *Compare* 29 C.F.R. § 825.302(c) (requiring in the case of foreseeable leave that "[a]n employee . . . provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave . . . ."), *with* C.F.R. § 825.303(a) ("Notice [in the case of unforeseeable leave] may be given by the employee's spokesperson (e.g., spouse, adult family member, or other responsible party) if the employee is unable to do so personally.").

Stops argues that "as of March 31, 2009, the date of her termination,"[9] Singletary did not say anything that reasonably apprised Stops that she needed leave for a serious health condition. (Doc. No. 39 at 23.) The Court agrees. Singletary's statements to Wingo on Monday, March 30 and Singletary's telephone calls to Hudson and Knight on Tuesday, March 31 do not create a genuine

---

[9] Stops does not argue that the Court should only consider the notice provided by Singletary prior to its decision to terminate Singletary on March 31. *Cf. Satterfield*, 135 F.3d at 980 (considering only the notice that the employee gave the employer prior to its discharge decision). Accordingly, the Court will not limit its analysis to the notice provided by Singletary prior to Hudson first notifying Singletary of her termination.

issue of material fact that Singletary made Stops aware that her absence from work was due to a potentially FMLA-qualifying reason.

Singletary qualified for FMLA leave if she had a "serious health condition" that made her "unable to perform the functions of [her] position . . . ."[10] 29 U.S.C. § 2612(a)(1)(D).  A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves:  (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11).  The parties do not argue, and the Court does not find, any evidence that the first part of this definition applies here.  (Doc. No. 43-1 at 24.)  Thus, Singletary was required to put Stops on reasonable notice of a potential illness involving "continuing treatment by a health care provider."

The phrase "continuing treatment by a health care provider" is defined in relevant part as follows:

> A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:
>
> (a) Incapacity and treatment. A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>
> (1) Treatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
>
> (2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.

---

[10] The parties do not contend that Singletary qualified for FMLA leave under any other provision of 29 U.S.C. § 2612(a)(1).

(3) The requirement in paragraphs (a)(1) and (2) of this section for treatment by a health care provider means an in-person visit to a health care provider. The first (or only) in-person treatment visit must take place within seven days of the first day of incapacity. . . .

29 C.F.R. § 825.115.  Under this definition, a "serious health condition" requires: (1) a period of incapacity of more than three consecutive, full calendar days; and (2) a course of treatment.  *Id.* "The term 'incapacity' means inability to work, attend school, or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b).

Singletary's statements to Wingo, Hudson, and Knight on Monday, March 30 and Tuesday, March 31 did not reasonably permit the conclusion that Singletary potentially would be unable to work for three days due to her illness and that her illness would require a course of treatment.  On Monday, March 30, Singletary told Wingo that she did not "feel good" and that there was a "high possibility" that she had mononucleosis, which, according to Singletary, was "highly contagious." (Doc. No. 43-1 at 20.)  Wingo permitted Singletary to leave work to see a doctor on the assumptions that Singletary might have mononucleosis and that mononucleosis was contagious.  (*Id.*)  Wingo also instructed Singletary to call her the following day to let her know what the doctor said and told Singletary that "we'll go from there."  (*Id.*)  On Tuesday morning, Singletary called Wingo as instructed, and when she was unable to reach Wingo, contacted Stops' human resources department and explained "what had happened the day prior with [Wingo]," that she was "sick," that she "had been to the doctor on Monday," that she had a doctor's note, that she was "running a temperature," that it was "very highly possible" that she had mononucleosis, and that mononucleosis test results were pending.  (Doc. No. 43-1 at 21-22.)

Singletary informed Stops through Wingo that she possibly had mononucleosis and that mononucleosis was contagious.  Notice that Singletary possibly had a contagious illness, by itself, did not notify Stops that Singletary was absent due to a potentially FMLA-qualifying serious health condition.  *See Seidle v. Provident Mut. Life Ins. Co.*, 871 F. Supp. 238, 246 (E.D. Pa. 1994) ("[T]he FMLA and its implementing regulations defining 'serious health condition' are not concerned with the potential dangers of an illness but only with the present state of that illness."); *see also Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008-09 (7th Cir. 2001) ("A reference to being "sick" . . . [c]ertainly . . . did not suggest to the employer that the medical condition might be serious or that the FMLA otherwise could be applicable."); 29 C.F.R. § 825.113(d) ("Ordinarily, unless complications arise, the common cold, the flu, . . . etc., are examples of conditions that do not meet the definition of a serious health condition and do not qualify for FMLA leave.").  Because Singletary had been to the doctor on Monday, allegedly had a doctor's note, and had a history of unauthorized absences, it would not have been unreasonable for Singletary to provide Stops more information about her illness on Tuesday than the fact she was "still sick," that she "did not feel good," that she was "running an temperature," and that she was waiting on mononucleosis test results.  (Doc. No. 43-1 at 21-22); *see Satterfield*, 135 F.3d at 982 (finding that an employee's notice that she "was having a lot of pain in her side" and would not be at work was insufficient notice in view of the employee's history of unexcused absences and the employee's failure to notify the employer of the status of her condition, her scheduling of a doctor's appointment, and her expectation that her condition would not improve prior to the doctor's appointment four days later).

At no time on Monday, March 30 or Tuesday, March 31 did Singletary say or do anything reasonably notifying Stops that her illness inhibited, let alone prevented, her from performing her

job functions. *See* 29 C.F.R. § 825.303(b) (noting that information sufficient to meet the employee's notice burden includes, *inter alia*, a statement "that a condition renders the employee unable to perform the functions of the job . . . and the anticipated duration of the absence, if known"). On Monday, March 30, Singletary did not inform Wingo of any symptoms or ailments that impaired her job performance; Singletary merely told Wingo that she did not "feel good" but was able to "finish out the day and do [her] job." (Doc. No. 43-1 at 20.) Wingo then permitted Singletary to leave work to see a doctor, instructed Singletary to call in on Tuesday, and told Singletary "we'll go from there." (*Id.*) However, in view of Singletary's admission that she was able to finish working Monday, Wingo's actions did not demonstrate that Singletary placed Stops on notice that Singletary's illness was potentially FMLA-qualifying.

Further, at no time on Monday or Tuesday did Singletary tell Stops that she was under doctor's orders not to work due to her existing illness or the pending mononucleosis test results. Although Singletary felt "much worse" on Tuesday morning, she did not tell Stops that her illness was worsening or that she felt physically unable to work. (*Id.* at 21.) Rather, she told Hudson and Knight that she was "sick," "did not feel good," felt she had mononucleosis, was "running a temperature," "had been to the doctor Monday," "had a doctor's note,"[11] was waiting on mononucleosis test results, and "would not be in." (*Id.* at 21-22.) None of Singletary's statements reasonably indicated that she was physically unable to perform her job functions, which included:

---

[11] Singletary's failure to produce any evidence beyond her equivocal deposition testimony that she in fact had a doctor's note on Tuesday, March 31 as she told Hudson and Knight arguably bars her FMLA claim. *See Gay*, 125 F.3d at 1436 ("When notice of a possible serious medical condition is deliberately withheld and false information is given, it cannot be said that an employee has been terminated in violation of the FMLA."). However, even if Singletary in fact had a doctor's note on March 31 as she claimed, her notice was insufficient.

answering phones, taking customer requests over the phone, and attending the front desk.  (Doc. No. 43-1 at 6.).

In summary, Singletary's statements to Wingo on Monday, March 30 and phone calls on Tuesday, March 31 were tantamount to "calling in sick without providing more information" and thus were insufficient as a matter of law to reasonably inform Stops that her illness was potentially FMLA-qualifying.   29 C.F.R. § 825.303(b).   Finding no evidence creating a genuine issue of material fact to the contrary, Singletary's FMLA claims fail due to insufficient notice.[12]

In summary, Singletary was ineligible for FMLA leave because she did not have a serious health condition or, alternatively, because she failed to provide Stops with sufficient notice that her absence from work was due to a potentially FMLA-qualifying serious health condition.  *Cruz*, 428 F.3d at 1386; *Russell*, 346 F.3d at 1340.  In view of Singletary's ineligibility for FMLA leave, summary judgment should be granted for Stops on Singletary's FMLA interference and retaliation claims.

## Conclusion

Based on the foregoing, it is hereby **ORDERED** and **ADJUDGED** that:

1.      The Motion to Preclude Dr. Hardoon's Testimony at Trial by Defendant Stops, Inc. (Doc. No. 45) is **GRANTED**.

2.      The Motion for Summary Judgment by Defendant Stops, Inc. (Doc. No. 39) is **GRANTED**.

---

[12] Hardoon's expert testimony, ruled inadmissible *supra* part I, is not relevant to the sufficiency of Singletary's notice to Stops.  Therefore, even if Hardoon's expert testimony was admissible, summary judgment would be granted for Stops because Singletary did not sufficiently notify stops that her absence was due to a potentially FMLA-qualifying reason.

3.      The Clerk shall enter Final Judgment in favor of Defendant Stops, Inc. and against

Plaintiff Patricia Singletary on all claims and close the case.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on September 7, 2010.

PATRICIA C. FAWSETT, JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Counsel of Record